UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JOAN HOLDEN and ELEANOR COBB,

                                Plaintiffs,

           -against-

EAST HAMPTON TOWN, THOMAS RUHLE,
MICHAEL DESARIO, GERRY MOONEY,
WINDMILL HOUSING DEVELOPMENT FUND
CO., INC., WINDMILL VILLAGE II HDFC,
WINDMILL VILLAGE LLC, WINDMILL
VILLAGE II INC., ST. MICHAEL'S WINDMILL
HDFC, and ST. MICHAEL'S WINDMILL
HOUSING ASSOC. LP,

                           Defendants.
-------------------------------------------------------------X

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   MAR 3 1 2017   ★

**LONG ISLAND OFFICE**

MEMORANDUM AND ORDER

15-CV-4478
(Wexler, J.)

APPEARANCES:

      LAWRENCE E. KELLY, ESQ.
      BY: Lawrence E. Kelly, Esq.
      Attorney for Plaintiffs
      11 Cedar Bay Court
      Bayport, New York 11705

      SOKOLOFF STERN LLP
      BY: Brian S. Sokoloff, Esq. and Kevin Levine, Esq.
      Attorneys for Defendants East Hampton Town & Thomas Ruhle
      179 Westbury Avenue
      Carle Place, New York 11514

      ROBINSON, BORG, LEINWAND, GREENE, GENOVESE & GLUCK, P.C.
      BY: Alan M. Pollack, Esq. and Felicia S. Ennis, Esq.
      Attorneys for Defendants Michael DeSario, Gerry Mooney, Windmill Housing
      Development Fund Co., Inc., Windmill Village II HDFC, Windmill Village LLC and
      Windmill Village II Inc.
      875 Third Avenue, 9th Floor
      New York, New York 10022

WEXLER, District Judge:

      Plaintiffs Joan Holden ("Holden") and Eleanor Cobb ("Cobb") (collectively, "Plaintiffs")

commenced this action alleging violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604,

as well as violations to various constitutional rights by defendants East Hampton Town (the "Town") and Thomas Ruhle ("Ruhle") (collectively, the "Town defendants"), and by defendants Michael Desario ("Desario"), Gerry Mooney ("Mooney"), Windmill Housing Development Fund Co., Inc., Windmill Village II HDFC, Windmill Village LLC, and Windmill Village II Inc. (collectively, the "Windmill defendants").[1]  Currently before the Court are each defendant's motion to dismiss pursuant Rule 12 (b)(6) of the Federal Rules of Civil Procedure.  *See* Windmill defendants' Motion, DE [26]; Town defendants' Motion, DE [21].  For the reasons set forth herein, the Windmill defendants' motion is granted, and the Town defendants' motion is granted in part and denied in part.

## I. BACKGROUND

### A. Factual Allegations

At the outset, the Court notes that the Amended Complaint, is not a model of clarity and is not organized in any discernible manner, and thus the Court has spent considerable time wading through its 38, single-spaced pages in an attempt to piece together any factual allegations buried within the sweeping generalizations.  The Court was able to cull the following factual recitation from the allegations of the Amended Complaint ("Am. Compl."), DE [18].

#### 1. The Parties

The Town of East Hampton is a municipal corporation that receives federal funds for housing.  Ruhle is the Director of the East Hampton Town Office of Housing and Community Development ("Office of Housing").

The Windmill entities are related organizations and, according to their website, are privately owned and run housing projects.  Mooney is "part of the management team" that runs

---

[1] Plaintiffs' claims against defendants St. Michael's Windmill HDF and St. Michael's Windmill Housing Assoc. LP were dismissed by stipulation. *See* Stipulation and Order, Docket Entry ("DE") [38].

the housing projects owned and operated by the Windmill Defendants, while Desario is the principal officer of the Windmill Defendants.

Windmill Village LLC (referred to as "Windmill II") was built in 2003 and is a "housing choice voucher complex" that accepts Section 8 vouchers distributed by the Town to qualified applicants over the age of 62. Holden and Cobb are residents of Suffolk County, and were leaseholders and residents at Windmill II in 2013.

Within Section 8 housing programs, the Section 202 program provides housing for low-income elderly people (over 62 years old and earning below 50% of the regional median income. Section 202 programs provide financial support such as rental assistance "by the entity administering the Housing Assistance Payments ("HAP") Contract." Section 202 capital allowances are paid directly by the Housing entity (Town Housing Office) to the landlord (Windmill) and need not be repaid "if the housing remains in the service of Section 8 elderly tenants for the duration of forty years." Am. Compl. ¶27.

### 2. Mold Conditions at Windmill II

The Windmill II complex suffered from "widespread and chronic mold contamination." Am. Compl. ¶32. Plaintiffs' claims arise out of mold contamination and remediation, or the lack thereof, at the Windmill II housing complex in which they resided. To the extent dates are provided, the incidents underlying Plaintiffs' complaint occurred in 2013 and 2014. The mold issue at the complex apparently pre-dated those incidents. Previously, from 2009-2012, the Town held back federal rent subsidies until the Windmill defendants "provided some minimal proof they were responding in some way to the initial mold findings." *Id.* ¶97. Plaintiffs further allege that given the "partnership" between the Town and Windmill defendants, the monies were ultimately released despite the lack of evidence of professional remediation.

3

On or about May 16, 2013, Holden attended a meeting at which a vote was held and she "received the support of the tenants to lead a tenants committee to address" the mold conditions. Am. Compl. ¶82.  There is no indication of where this meeting took place or who was in attendance, but Holden interprets this vote as establishing her selection as a tenant representative. Cobb was also active in the tenants' association and supported Holden.  After Holden's selection as tenant representative in 2013, Desario, Mooney, and Ruhle "worked to restrict that free speech and freedom of association right and to undercut that choice." *Id.* ¶88

Plaintiffs claim that during summer of 2013, the defendants were "engaged in efforts to obtain tax credits and finance" and thus "were interested in suppressing Windmill II tenant advocacy so as not to be transparent to potential financial investors." Am. Compl. ¶87.  In August 2013, a number of tenants hired a company to take mold samples.   The results of this testing "indicated mold colonization at dangerously elevated levels at the Windmill II complex." *Id.* ¶86.  Plaintiffs allege that the Windmills defendants feared their expansion plans would be jeopardized by tenant advocacy that might result in a disclosure that the mold conditions had never been professionally remediated and had actually accelerated since the initial 2009-2012 report.

In or around Labor Day of September 2013, remediation was conducted at Windmill II. Plaintiffs claim that the "purported remediation" in September 2013 was performed by workers "of unknown relationship with any of the entities" who wore no protective gear, provided "no protective shield from spread of mold," created a new fire hazard by eliminating a firewall.  Am. Compl. ¶¶112-13.  Plaintiffs describe the Windmill defendants' remediation efforts as "amateurish."

In addition to their allegations about the poor quality of the work performed, Plaintiffs allege that they were given short notice of the work.  Their allegations regarding the length of the notice period vary from beginning "within a matter of hours" to "48 hour warning of basement remediation."  Am. Compl. ¶¶ 106, 67(P), respectively.  The workers allegedly commenced remediation by "taking and destroying any and all of their stored belongings in the basement areas which were not physically removed by the tenants."  *Id.*  ¶106.  Holden does not allege any specific loss during this cleaning, but Cobb claims to have lost specific items in the remediation including sports memorabilia.  They allege that these actions were taken in retaliation for their First Amendment expression as "whistle blower" tenants.  *Id.*  ¶¶108, 117.

Plaintiffs attended a Town Board meeting on or about on or about February 4, 2014.  Cobb was told they would not be allowed to speak at the meeting, but nevertheless, both Holden and Cobb spoke during the public comment portion of the meeting.  During their presentations, both "discussed the mold remediation steps they understood needed to be taken."  Am. Compl. ¶103.  Plaintiffs allege that the Town Board directed Desario "to sit down with the tenants to resolve the matter."  *Id.*  Ruhle and the Windmill Defendants, however, "refused to meet with the tenant's designated representative in violation of clearly established law."  *Id.*  ¶110.  Although the complaint is unclear, the implication is that Holden is the representative with whom they declined to meet.

After the February 2014 Board Meeting, Holden and Ruhle exchanged a series of e-mails regarding a meeting to take place with the Town.  Plaintiffs allege that Holden was selected by the tenants as "a tenant representative," but that defendants "moved to name their own management designated representatives from the tenant population."  Am. Compl. ¶34.  Holden cites one sentence from one email to support her argument, alleging that Ruhle wrote "the

5

representatives for the meeting organized by my Office will be selected by my Office." ¶133.[2]

The entire email, sent on February 18, 2014, reads as follows:

> The representatives for the meeting organized by my Office will be
> selected by my Office for our meeting only.  If more than two
> people volunteer there will be a secret ballot vote by the tenants to
> select the two representatives.  Anyone not interested in the
> process should not participate.  We of course hope everyone will
> participate.  I have always believed that elections cho[o]se the best
> representatives.

Declaration of Kevin Levine, Ex. L, DE [22-1].  There are no allegations in the complaint

regarding whether other representatives ultimately were selected, either by the Town or the

tenants, or whether any meeting ever took place.

### 3. Termination of Holden's Section 8 Benefits

Holden alleges that, rather than acknowledging her as the tenant representative, Ruhle

"moved to formally evict" her and "suppress her advocacy for true remediation of the mold

conditions."  Am. Compl. ¶111.  By letter dated February 25, 2014, three weeks after Holden's

appearance at the Town Board meeting, Ruhle advised Holden that "she was being terminated

from the Section 8 Housing Choice Voucher Program for being 'absent from your unit for more

than thirty (30) consecutive days without notifying this office.'"  *Id.* ¶134.  Plaintiffs allege that

the termination letter was intended to preclude public participation and free speech for the

tenants.  Holden's benefits were terminated.[3]

### 4. Other Conduct by the Individual Windmill Defendants

Plaintiffs allege that defendant Mooney had a pass key and entered apartments "on a non

emergency basis without reasonable notice or permission," Am. Compl. ¶67(G), but provide no

---

[2] Plaintiffs cite only a small portion of the email exchange.  As it has been used in the complaint, the Court will consider the balance of the exchange on this motion.

[3] The Town's decision to terminate Holden's benefits was the subject of a hearing and a decision by an Impartial Hearing Officer which upheld the termination.

specific information about these entries such as dates, frequency, or duration. Plaintiffs claim that this conduct was intended to intimidate the tenants. On one occasion, Mooney co-authored a memorandum to all tenants giving notice to need for access to units on December 4, 2013.

Mooney also allegedly changed the locks on Holden's door "without any due process procedure, hearing, or notice." Am. Compl. ¶67(L). Again, no specific information on this incident is offered. Holden, who apparently had prior dealings with Mooney while residing at a different property, further claims that he restricted her free speech rights by "mandating that [she] sign an agreement to give up any free lance writing work" and making this a "bogus condition of her retaining her rights to housing." Id. ¶¶67(H), 82. Mooney alleged indicated to Holden "you do not represent the tenants." Id. ¶67(K). No context or other specifics were provided.

Allegations regarding the individual conduct of Desario are limited. Plaintiffs claim that the family of one of the tenants offered free professional mold remediation to Desario, but he refused. In addition, Desario was interviewed by a local paper and said the mold was confined to basement. He further asserted that Windmill II employees were capable of performing the remediation.

The remaining allegations regarding Desario and Mooney also offer speculation and conclusions without factual content. Plaintiffs allege that Desario and Mooney: in 2002 during construction, "allowed for a lack of drainage and improper construction methods," Am. Compl. ¶78; diverted Windmill II funds to other projects, id. ¶79; had a duty to care for the vulnerable population at Windmill II, id. ¶76; worked to restrict and undercut the tenants' choice of Holden as representative, id. ¶ 88; and sought to suppress Plaintiffs' First Amendment rights. Id. ¶102.

**B. State Court Action**

Plaintiffs, along with two other tenants, commenced an action in Suffolk County Supreme Court on or about March 21, 2014 against the Town and the Windmill Defendants. Declaration of Felicia S. Ennis ("Ennis Decl."), Verified Complaint, Ex. B, [DE 26-3]. That complaint asserted causes of action for negligence, breach of warranty of habitability, nuisance, breach of contract, and constructive eviction, all pertaining to the mold-related conditions at Windmill II. By Order dated October 6, 2014, the Town defendants' motion to dismiss was granted due to plaintiffs' failure to serve the requisite notice of claim. Ennis Decl., Order, Ex. C, [DE 26-4].

**C. Complaint in This Action**

The action in this case was commenced on or about July 31, 2015. On or about January 7, 2016, Plaintiffs amended their complaint. The Amended Complaint states three causes of action: (1) violation of Plaintiffs' First Amendment rights to freedom of speech and association; (2) discrimination and failure to accommodate under the FHA; and (3) violations of substantive due process and liberty interests.

Plaintiffs claim that as a result of the "intentional misconduct of the defendants," they suffered *inter alia* "debilitating health, continuing emotional and physical harm" and that "following medical advice, found alternative methods of dealing with the dangerous conditions." Am. Compl. ¶148, thus attributing these injuries to the mold condition. Holden further claims that she was subjected to termination proceedings in retaliation for her speech.

**II. LEGAL STANDARDS**

**A. Motion to Dismiss**

Defendants seek dismissal of the action pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The standards for analyzing a motion to dismiss are

well-established. The court must accept the factual allegations in the complaints as true and draw all reasonable inferences in favor of the plaintiff. *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (citations omitted). The court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S at 678 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007)).

The determination of "whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S at 679. A pleading that does nothing more than recite bare legal conclusions, however, is insufficient to "unlock the doors of discovery." *Iqbal*, 556 U.S. at 678-679; *see also Twombly,* 550 U.S. at 555 (holding that a "formulaic recitation "formulaic recitation of cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level."). While Rule 8 does not require "detailed factual allegations," it does require more than an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (citing *Twombly,* 550 U.S. at 555).

**B. Section 1983**

Section 1983 does not create substantive rights, but rather provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan,* 443 U.S. 137, 144 n.3, 99 S. Ct. 2689 (1979). A plaintiff must allege that the challenged conduct (1) was committed by a person acting under color of state law and (2) deprived plaintiff "of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir. 1994)). Moreover, "the under-color-of-state-law element of § 1983 excludes from its reach merely

9

private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50, 119 S. Ct. 977 (1999) (citation and internal quotation marks omitted). In addition, it is "well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (internal quotation and citation omitted).

## III. DISCUSSION

### A. Section 1983 Claims – State Action

The Windmill defendants claim that they are not state actors and thus cannot be liable under Section 1983. The Court agrees.

The Windmill defendants privately own and operate complexes, including Windmill II, and accept subsidized rental payments from the Town's Housing Office for qualified low-income tenants. Even if all the tenants in the complex were Section 8 voucher recipients, the Supreme Court "has repeatedly held that a private entity's dependence on government funding does not make the organization a state actor." *Archer v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.,* 30 F. Supp. 2d 600, 605 (E.D.N.Y. 1998). Thus, the Windmill defendants can only be considered state actors if their acts are attributable to the state.

The conduct of a private entity may be deemed to be state action only under certain circumstances:

> (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the state," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the state," ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir.2008) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296, 121 S. Ct. 924

(2001)).  Based on the allegations in the Amended Complaint, Plaintiffs appear to argue that the Windmill defendants performed a public function or that their actions were so intertwined with those of the Town as to constitute joint action.

Under the public function test, "the exercise by a private entity of powers traditionally exclusively reserved to the State" can constitute state action. *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 352, 95 S. Ct. 449 (1974).  Providing low-cost housing does not constitute a "public function" within the meaning of Section 1983 because it is not an activity or function exclusively reserved by the state. *See Young v. Halle Hous. Assocs., L.P.,* 152 F. Supp. 2d 355, 365 (S.D.N.Y. 2001) ("the provision of housing, for the poor or for anyone else, has never been the exclusive preserve for the state, but has been left to a regulated, and occasionally subsidized, private marketplace.").  Thus the Windmill defendants are not state actors on this basis.

Plaintiffs further point to the joint actions of defendants as a basis for finding that the Windmill defendants were state actors.  "The actions of a private entity may be deemed state action only if 'there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.'" *Lopez v. Zouvelos*, No. 13-CV-6474, 2014 WL 843219, at *4 (E.D.N.Y. Mar. 4, 2014) (quoting *Am. Mfrs. Mut. Ins.*, 526 U.S. at 50).  A private entity "does not become a state actor for purposes of § 1983 merely on the basis of 'the private entity's creation, funding, licensing, or regulation by the government.'" *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (quoting *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 112 (2d Cir. 2003)).

Plaintiffs allege various conduct between the Windmill defendants and the Town defendants that they claim demonstrate joint action or a close nexus.  For example, they point to the close working relationship between the Town and Windmill regarding the development of additional properties and tax breaks given to Windmill.  These allegations are largely speculative, and significantly, none of the alleged joint activity relates directly to Plaintiffs'

claims.  The close nexus test is not determined by the general relationship between the parties, but rather whether there is a sufficiently "close nexus between the State and the *challenged action*" such that the conduct "may be fairly treated as that of the State itself." *Jackson,* 419 U.S. at 351 (emphasis supplied).  It is also insufficient "to plead state involvement in *some activity* of the institution alleged to have inflicted injury upon a plaintiff; rather, the plaintiff must allege that the state was involved with the *activity that caused the injury* giving rise to the action." *Sybalski v. Indep.Grp. Home Living Program, Inc.,* 546 F.3d 255, 257-58 (2d Cir. 2008) (emphasis in original; internal quotation and citations omitted); *see also Young,* 152 F. Supp. 2d at 364 (noting that the "crucial relationship for a finding of state action is between the governmental entity and the *action* taken by the private entity, not between the governmental entity and the private actor.").  The factual allegations here do not plausibly allege a nexus between the Town and Windmill in respect to the Plaintiffs' claims that their First or Fourteenth Amendment rights were violated.

Plaintiffs also claim that Windmill and the Town enjoyed a "symbiotic" relationship. Such a relationship may be found if the state has "so far insinuated itself into a position of interdependence with [the non-state actor] that it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S. Ct. 856 (1961).  Courts have noted that "Supreme Court decisional law has given *Burton* a very narrow interpretation," and with one possible exception, "has rejected every attempt to establish state action on the basis of *Burton.*" *Khulumani v. Barclay Nat'l Bank Ltd.,* 504 F.3d 254, 314 n.8 (2d Cir. 2007) (quoting 1 Martin A. Schwartz, Section 1983 Litigation: Claims and Defenses § 5.13[A], (4th ed. 2003)).  Courts that continue to consider symbiosis "often examine whether the government has control over the private actor's day-to-day operations and whether the government shares in any profits the private entity has generated *from the challenged conduct.*" *Forbes v. City of New York,* No. 05 Civ. 7331, 2008 WL 3539936, at *7 (S.D.N.Y. Aug. 12,

12

2008) (emphasis in original); *see generally Hollman v. Cnty. of Suffolk*, No. 06-CV-3589, 2011 WL 280927, at *7 (E.D.N.Y. Jan. 27, 2011) (finding no symbiosis where state had no direct pecuniary interest in, or extensive management control or influence over the non-state actor).

Here, the Amended Complaint fails to allege any facts that would support a finding that the Town and Windmill were in a symbiotic relationship that would make the latter a state actor. There are no allegations of profit sharing or that the Town had any control over Windmill's daily operations. Plaintiffs point to Ruhle's statement at a Town Board meeting in April 2015 that there was a "partnership" between the Town and "landlords such as the Windmill Defendants," Am. Compl., ¶52, as evidence of a symbiotic relationship. This reference is, by itself, insufficient for the court to infer that the Town had the degree of control over Windmill that would establish a symbiotic relationship.

The Court finds that Plaintiffs have failed to plausibly allege any facts that establish the Windmill defendants as state actors. Accordingly, the Windmill defendants' motion to dismiss the Section 1983 claims is granted.

## B. First Amendment Retaliation Claims

A First Amendment retaliation claim requires a plaintiff to show "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). A plaintiff may pursue her claim if she can show that her speech was chilled, or the she has suffered "some other concrete harm." *Id.*

### 1. Cobb

Cobb's allegations regarding exercise of her First Amendment rights do not state a claim for relief. She alleges that she took part in tenant meetings in May 2013 and supported Holden, but does not allege that any defendant was aware of her activities. Although she claims that

some of her property was destroyed during the remediation efforts in September 2013, she has not pled any plausible facts that incident was motivated by her protected activities.   Her only specific allegation regarding a restriction of her First Amendment rights of which defendants was aware concerns the February 2014 Town Board at which she alleges she was told that she would not be allowed to speak.   Whether or not that representation was made, it is undisputed that Cobb did, in fact, speak at that meeting.

As to any injury she suffered, Cobb alleges that she "was forced to move and take an apartment in a different town, under Section 8 subsidized housing parameters but away from the malign influence of the defendants." Am. Comp. ¶149.   Again, the complaint fails to supply any context for this allegation and fails to satisfy the minimum pleading requirements under Rule 8.[4]

2. Holden

Holden also fails to allege any facts that defendants were aware of her protected activities in May 2013, let alone that those activities motivated any defendant to retaliate against her.   As to whether she was prevented from speaking as the tenant representative, Holden relies primarily on one statement made by Ruhle, but taken out of context.   A review of the complete email from Ruhle does not support Holden's claim that Ruhle intended to select tenant representatives himself on the Town's behalf as he clearly indicates an intention to allow the tenants to choose. Moreover, the complaint is silent as to whether any such meeting ever took place.   Thus Holden has not plausibly alleged a violation of her First Amendment rights as they relate to her representation of the tenants.

Whether the Town's decision to terminate her Section 8 benefits constitutes retaliation for her conduct requires a different result on this motion.   The Hearing Officer determined that the Town was within its rights to terminate Holden's benefits.   A plaintiff may, however,

---

[4] Defendants also refer to Cobb's lease, which was incorporated by reference into the complaint, and suggest that she voluntarily left prior to the expiration of that lease on November 20, 2013.  Levine Decl., Ex. C.

establish First Amendment retaliation "even if the measures taken by the state were otherwise justified," if she can show that defendants "for improper motive, took regulatory action that was significantly more serious than other action he had discretion to take." *Mangino v. Inc. Vill. of Patchogue,* 808 F.3d 951, 957 (2d Cir. 2015); *see also Beechwood Restorative Care Ctr. v. Leeds,* 436 F.3d 147, 152 (2d Cir. 2006) (noting that "a plaintiff can prove First Amendment retaliation even if the measures taken by the state were otherwise justified"). Despite the sparseness of the allegations, Plaintiffs clearly allege that Holden engaged in protected speech at the February 4, 2014 Town Board meeting, that Holden and Ruhle subsequently exchanged e-mails regarding Holden's desire to represent the tenants at future meetings, and that Ruhle sent a letter dated February 25, 2014 terminating Holden's voucher rights. The temporal proximity of these events alone warrants denial of the motion to dismiss at this stage of the proceedings. [5]

## C. Due Process Claims

The third cause of action asserts a "Fifth and Fourteenth Amendment violations of substantive due process and liberty interests." Plaintiffs claim that they were deprived of unspecified "liberty interests" by the actions of defendants "which were arbitrary and conscience shocking in a constitutional sense" by, *inter alia,* maintaining and failing to resolve mold conditions, subjecting plaintiffs to "unauthorized and unnoticed searches of their private apartments and seizures of personal items, refusing to deal with the tenant representative, and limiting the freedom of association.

Any Fifth Amendment claim fails because that amendment "pertains only to actions of the federal government" and no defendant here is a federal actor. *Rini v. Zwirn,* 886 F. Supp. 270, 289 (E.D.N.Y. 1995). To the extent Plaintiffs have due process claims against nonfederal

---

[5] Even if the Windmill defendants were found to be state actors, Cobb's first amendment retaliation claims are insufficient to state a claim against them. As to Holden's claim, only the allegations regarding the Town and termination of her Section 8 benefits are sufficient to survive this motion.

actors, those claims "arise solely from the Fourteenth Amendment due process clause." *Mitchell v. Home,* 377 F. Supp. 2d 361, 372-73 (S.D.N.Y. 2005) (citations omitted).

A plaintiff asserting a substantive due process claim must first identify the right at issue. Here, it is unclear what liberty interest Plaintiffs are asserting. It is clear, however, that "where another provision of the Constitution 'provides an explicit textual source of constitutional protection,' a court must assess a plaintiff's claims under that explicit provision and 'not the more generalized notion of "substantive due process."'" *Kia P. v. McIntyre*, 235 F.3d 749, 757–58 (2d Cir. 2000) (quoting *Conn v. Gabbert*, 526 U.S. 286, 293, 119 S. Ct. 1292 (1999) (internal quotation and citation omitted)); *see also Velez v. Levy,* 401 F.3d 75, 94 (2d Cir. 2005) ("where a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."). To the extent their claims implicate any liberty interest under either the First or Fourth Amendments, such claims are not properly analyzed as substantive due process claims. *See Lauro v. Charles,* 219 F.3d 202, 205 (2d Cir. 2000) ("where a claim can be characterized as a violation of the Fourth Amendment, it should be analyzed as such, and not as a substantive due process claim."); *C.T. v. Valley Stream Union Free Sch. Dist.,* 201 F. Supp. 3d 307, 320 (E.D.N.Y. 2016) (a "generalized substantive due process claim must be subsumed into the First Amendment claim.").[6]

Eliminating these claims leaves Plaintiffs' allegations regarding their health as impacted by the mold condition and defendants' failure to remediate that condition. A substantive due process claim "'must begin with a careful description of the asserted right,' *Reno v. Flores,* 507 U.S. 292, 302 (1993), as courts are 'reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in which unchartered area are scarce and

---

[6] While Plaintiffs have not asserted a Fourth Amendment claim for illegal search and seizure, such a claim would fail as the allegedly illegal conduct was performed solely by the Windmill defendants who were not state actors.

open-ended.' *Washington v. Glucksberg,* 521 U.S. 702, 720 (1997)." *Coley v. Brook Sharp Realty LLC,* No. 13 Civ. 7527, 2015 WL 5854015, at *4 (S.D.N.Y. Sept. 25, 2015). Plaintiffs have failed to articulate a liberty interest of a right to housing conditions. The Court need not determine whether such a liberty interest exists, however, as the allegations here simply do not rise to the level of "shocking the conscience."

"Substantive due process protects against government action that is arbitrary, conscience shocking, or oppressive in a constitutional sense, but not against a government action that is 'incorrect or ill-advised.'" *Kaluczky v. City of White Plains,* 57 F.3d 202, 211 (2d Cir. 1995); *see also Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 845, 118 S. Ct. 1708 (1998) ("[T]he touchstone of due process is protection of the individual against arbitrary action of government" (internal quotation and citation omitted)); *Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir. 1999)( "Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority."). From the allegations of the Amended Complaint, it is clear that remediation efforts were undertaken by Windmill, but were not effective according to Plaintiffs. *See, e.g.,* Am. Compl. ¶67(P) (describing Windmill's remediation efforts as "amateurish" and "incompetent"). Thus, Plaintiffs' allegations regarding the sufficiency of those efforts sound in negligence and "mere negligence will never give rise to a substantive due process violation." *O'Connor v. Pierson,* 426 F.3d 187, 203 (2d Cir. 2005) (citing *Daniels v. Williams,* 474 U.S. 327, 328, 106 S. Ct. 662 (1986)).

Finally, under the facts alleged, the Town defendants were not responsible for maintaining the Windmill II complex. Under the Section 8 program, local housing authorities, such as the Town's Housing Office, "subsidize rental payments for qualifying low-income tenants in privately-owned buildings." *Mhany Mgmt., Inc. v. Cnty. of Nassau,* 819 F.3d 581, 588 (2d Cir. 2015) (citing 42 U.S.C. §1437f(o)(1)(A)). "Section 8 participants are tenants in privately-owned dwellings rather than dwellings owned by the federal government, state

government, local municipality, or [Office of Housing], so [Office of Housing] is not acting in the capacity of a 'landlord,' 'owner,' or 'seller' when it administers the program." *Taylor v. The Hous. Auth. of New Haven*, 267 F.R.D. 36, 48 (D. Conn. 2010), *aff'd sub nom. Taylor ex rel. Wazyluk v. Hous. Auth. of City of New Haven*, 645 F.3d 152 (2d Cir. 2011). Although the Town has an obligation to inspect the properties for which it provides Section 8 vouchers under certain circumstances, *see* 42 U.S.C. §1437(o)(8), there is no independent obligation for the Town to maintain the property. As discussed *supra,* the Windmill defendants are not state actors and thus no substantive due process claim may be asserted against them. Accordingly, the defendants' motions to dismiss the substantive due process claim are also granted.

## D. FHA Claim

The allegations within this cause of action clearly challenge the overall conditions at the Windmill II complex. For example, Plaintiffs allege that "Defendants were obligated to maintain their premises so as not to create a hazardous environment for the senior citizen tenants placed in their housing units, and, if such a situation did occur, to remediate the hazardous situation without exacerbating the precarious health conditions of the elderly tenants." Am. Compl. ¶165. The claim is not described as one directly challenging the overall conditions at the complex, however, since there is no private right of action for tenants for violations of federal housing standards by the complex owner under the FHA. *See, e.g., Alston v. Sebelius*, No. 13-CV-4537, 2014 WL 4374644, at *14 (E.D.N.Y. Sept. 2, 2014) ("There is no private right of action under the Housing Act enabling plaintiffs to sue defendants for violations of the statute and its implementing regulations over the poor quality of their Section 8 housing." (internal quotation and citation omitted)); *see also Rivera v. Phipps Houses Servs., Inc.,* No. 01 CIV. 2324, 2001 WL 740779, at *4 (S.D.N.Y. June 29, 2001) (noting that "Plaintiffs' claims most logically fit within the state law warranty of habitability and other state housing statutes which are binding

18

on § 8 owners by virtue of 24 C.F.R. 35.40.").  Section 8 does not provide individual rights.

Although Section 1437f(o)(8) imposes inspection requirements on the local agency, "[t]here is

no reference to what action should follow if a landlord fails an inspection, or to the consequences

if a local PHA fails to comply with its inspection obligations. Certainly, there is nothing in the

statute to suggest that a tenant, such as plaintiff, is entitled to relief under such circumstances."

*Bose v. City of New York*, No. CV-07-2431, 2008 WL 564761, at *6 (E.D.N.Y. Feb. 27, 2008).

In addition, courts have expressly found no viable section 1983 claim by a tenant challenging

habitability. *See id.,* 2008 WL 564761, at *8; *Rivera,* 2001 WL 740779, at *4 (to the court's

knowledge, "no court has permitted a § 1983 action to go forward against an owner for violation

of housing quality standards.").

Thus constrained, the explicit basis for Plaintiffs' claim is the FHA provision that

prohibits "a refusal to make reasonable accommodations in rules, policies, practices or services,

when such accommodations may be necessary to afford [the handicapped individual] an equal

opportunity to use and enjoy a dwelling."  42 U.S.C. §3604(f)(3)(B).   To state a claim

discrimination based on a failure to make a reasonable accommodation, "a plaintiff must

demonstrate that: (1) he suffers from a handicap ...; (2) defendants knew or reasonably should

have known of the plaintiff's handicap; (3) accommodation of the handicap may be necessary to

afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to

make such accommodation." *Bentley v. Peace and Quiet Realty 2 LLC,* 367 F. Supp. 2d 341,

344 (E.D.N.Y. 2005) (internal quotation and citation omitted).

Although the FHA uses the term "handicap," its definition is "virtually identical to the

definition of 'disability' in the Americans with Disabilities Act of 1990" and the two terms are

used interchangeably. *Austin v. Town of Farmington,* 826 F.3d 622, n.2 (2d Cir. 20116).

19

Plaintiffs cursorily describe their disabilities: Holden is disabled "by virtue of the respiratory limitations, asthma and health limitations as detailed in her medical treatment," and Cobb "by virtue of her lung cancer and mold in her eye and other conditions as detailed in her medical treatment." Am. Compl ¶¶163-64. Putting aside whether these "disabilities" are "handicaps" for purposes of the FHA, there is no non-conclusory allegation that defendants knew or should have known of the existence of either condition. For example, Plaintiffs allege that after 2011, tenants including themselves "indicated to defendants that they were suffering health conditions which their treating doctors ascribed to continued exposure in their HUD rent subsidized apartments to the large concentrations of mold." AC ¶174. This type of general allegation does not adequately plead defendants' awareness of their "handicaps."

Similarly, even assuming Plaintiffs suffered from handicaps and that defendants were on notice of their conditions, they have failed to allege any specific request for an accommodation. Defendants may not be held liable for refusing to provide an accommodation when they were never asked to provide one. *See, e.g., Tsombanidis v. W. Haven Fire Dep't,* 352 F.3d 565, 578 (2d Cir. 2003) ("[t]o prevail on a reasonable accommodation claim, plaintiffs must first provide the governmental entity an opportunity to accommodate them"). Plaintiffs suggest that their demands that the mold condition be further remediated constituted the requests for an accommodation. Pursuant to the FHA, the failure to make a reasonable accommodation pertains to those accommodations that may be necessary to afford plaintiff "an equal opportunity to use and enjoy the dwelling." Here, Plaintiffs were not requesting an accommodation to put them on an equal footing with other residents but were challenging the conditions at the entire property for all the residents. Indeed, Holden repeatedly argues that she was the tenants' representative and argued on behalf of all tenants.

It is apparent that Plaintiffs are simply attempting to re-package allegations regarding habitability as a failure to accommodate claim, an attempt that fails. As the Amended Complaint fails to state a plausible claim of housing discrimination under the FHA, Defendants' motions to dismiss the FHA claim are granted.

## E. Qualified Immunity

Defendant Ruhle seeks dismissal of the claims against him as he is entitled to qualified immunity. "Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does,* 779 F.3d 84, 92 (2d Cir. 2015). In light of the denial of the Town's motion as to Holden's First Amendment retaliation claim regarding the termination of her Section 8 vouchers and Ruhle's alleged role in that claim, a determination of qualified immunity is not appropriate at this time.

## IV. CONCLUSION

The Windmill Defendants' motion to dismiss is granted in its entirety. The Town Defendants' motion to dismiss is denied as to Plaintiff Holden's First Amendment retaliation claim regarding the termination of her Section 8 benefits and as to defendant Ruhle's assertion of qualified immunity, and granted in all other respects. The Clerk of the Court shall terminate Plaintiff Cobb and the Windmill defendants, Michael Desario, Gerry Mooney, Windmill

Housing Development Fund Co., Inc., Windmill Village II HDFC, Windmill Village LLC, and

Windmill Village II Inc..

SO ORDERED.

s/Leonard D. Wexler

LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
      March 31, 2017